747 A.2d 790 (2000)
329 N.J. Super. 273
Jodi Kohl BRAWER, Plaintiff-Respondent/Cross-Appellant,
v.
William A. BRAWER, Defendant-Appellant/Cross-Respondent.
Superior Court of New Jersey, Appellate Division.
Argued January 26, 2000.
Decided March 24, 2000.
*791 Francis W. Donahue, Shore Hills, for defendant-appellant/cross-respondent (Donahue, Braun, Hagan, Klein & Newsome, attorneys; Eric S. Solotoff, on the brief).
Barry L. Kaufman and Robert L. Ritter, Hackensack, for plaintiff-respondent/cross-appellant (Schiffman, Berger, Abraham, Kaufman & Ritter, attorneys; Mr. Kaufman, Mr. Ritter and Marianne Quinn, on the brief).
Before Judges BAIME, BROCHIN and BILDER.
The opinion of the court was delivered by BROCHIN, J.A.D.
Plaintiff Jodi Kohl Brawer and defendant William A. Brawer were married June 23, 1983. They have two children, Rebecca, born August 15, 1984, and Molly, born March 18, 1990. Mr. and Ms. Brawer were divorced by a judgment entered April 29, 1998. A supplemental judgment entered September 14, 1998 determined financial arrangements, custody and visitation.
Before trial, Ms. Brawer moved to enforce a settlement which she contended the parties had agreed to at the end of a ten-hour settlement conference on November 27, 1995. The motion was denied, and an eight-day bench trial was held to determine whether the parties had reached an enforceable settlement. Following the conclusion of that trial, the court ruled that there was no settlement. A subsequent thirteen-day trial on economic issues resulted in the entry of the September 14, 1998 supplemental judgment.
Mr. Brawer has appealed from that judgment. He contends that an excessive amount of alimony was awarded and that he should not have been assessed the entire fee of Seymour Rubin, C.P.A., the accountant whom both parties selected as an independent expert. Ms. Brawer has cross-appealed. She contends that the court erred by holding that the parties' settlement agreement was unenforceable and that Mr. Brawer should have been required to pay her attorneys' fees for the services which they performed for her during the period from the conclusion of the November 27, 1995 settlement conference through the end of the second trial. Alternatively, she argues that if the settlement agreement is not enforced, she should have been given a larger award of alimony, child support, equitable distribution, and attorneys' fees.
For reasons which we shall explain, we hold that the parties did reach an enforceable settlement of the economic issues ancillary to their divorce. Because of that holding, the parties' other contentions, except for Ms. Brawer's claim to additional attorneys' fees, are moot and therefore do not require discussion.
The November 27, 1995 settlement conference, which was held at Seymour Rubin's office, was the culmination of several meetings to discuss possible settlement. The conference began at approximately 10:00 a.m. and ended at approximately 8:00 p.m. For the most part, Mr. Brawer and his advisers remained together in one room and Ms. Brawer and her advisers were in another room. Mr. Rubin shuttled between the two "camps" with his own suggestions and with the parties' proposals and counter proposals. At least twice during the ten-hour conference, the Brawers, their advisers, and Mr. Rubin met together in Mr. Rubin's conference room.
Mr. Brawer's advisers at the conference were Lynne Strober, Esq., who was his attorney until she was replaced by his current counsel, and William Morrison, C.P.A., his accounting expert. Ms. Brawer's advisers at the conference were Barry Kaufman, Esq., her attorney, and Stuart Meyers, C.P.A., her accounting expert. Seymour Rubin was present with Dawn Lykins, his assistant. Mr. and Ms. Brawer, Mr. Rubin, Ms. Strober, and Mr. Kaufman *792 were present from the beginning to the end of the conference. Mr. Meyers left at approximately 2:00 p.m. and Mr. Morrison and Ms. Lykins at approximately 6:00 p.m.
Ms. Brawer testified herself and called Mr. Rubin, Mr. Kaufman and Mr. Morrison as witnesses at the trial of the settlement agreement. Mr. Brawer presented only his own testimony. Ms. Strober was not called to testify.
Mr. Rubin's, Mr. Kaufman's and Ms. Brawer's descriptions of what occurred at the conference were substantially the same. Mr. Morrison's testimony was less forthcoming, but it was not materially inconsistent with theirs. Mr. Brawer's testimony was at odds with that of the other witnesses. We will first summarize the testimony provided by Mr. Rubin, Mr. Kaufman and Ms. Brawer.
The two "camps" that were gathered at Mr. Rubin's office exchanged proposals and counter proposals throughout the day. 1By talking to Mr. Brawer in the presence of his attorney and to Ms. Brawer in the presence of her attorney, Mr. Rubin obtained each party's tentative agreement to various terms of a proposed settlement. As Mr. Rubin conveyed the various proposals to Mr. Brawer, Mr. Morrison would remind Mr. Brawer that only Mr. Brawer knew what he could afford, and Mr. Brawer responded that he "can take care of it."
At approximately 4:00 p.m., all of the terms that had been tentatively agreed to were withdrawn, presumably because of a deadlock on some other issues. There were further proposals and counter proposals. At 6:00 p.m., Mr. Rubin, Ms. Lykins, Mr. and Ms. Brawer, Mr. Kaufman, Ms. Strober, and Mr. Morrison gathered in Mr. Rubin's large conference room. At that time, the amount to be paid in child support was the only issue still in dispute. Mr. Brawer was willing to pay no more than $100,000 a year and Ms. Brawer was willing to accept no less than $115,000. At that point, Mr. Kaufman stepped out of the room with Ms. Brawer and, when they returned a few minutes later, he announced to all of those present-Mr. and Ms. Brawer, Ms. Strober, Mr. Morrison, Mr. Rubin, and Ms. Lykins-"[W]e have a deal," i.e., that Ms. Brawer would agree to $100,000.
When Mr. Rubin had satisfied himself that the parties had reached an agreement on the terms of a settlement and, as he testified, that "all that remained was to memorialize on paper that which had been agreed to," he told Ms. Lykins that she could leave and that he "would then take care of memorializing the notes." Points on which the parties had agreed were restated aloud either by Mr. Rubin, Mr. Kaufman or Ms. Strober. Mr. Rubin invited the participants to correct these restatements. He testified:
What I said, if anybody has any type of addition or any kind of comment, please make it. But I said it in the frame that ifcome on in, the water is fine. If you have anything to say, now is the time to say it.
The Brawers and their attorneys responded with comments.
Mr. Rubin's handwritten notes were introduced into evidence. Mr. Rubin testified that these notes reflect the final agreement of the parties as it was clarified by the comments of the participants in the conference between approximately 6:00 p.m. and 8:00 p.m. The notes are entitled, "5 WayAs Agreed By All Parties." "5 Way" presumably reflects the fact that the notes are the product of the restatement of the settlement by Mr. Rubin, Mr. and Ms. Brawer, Ms. Strober, and Mr. Kaufman.
According to Mr. Rubin's notes and testimony, Ms. Brawer was to receive permanent alimony of $150,000 a year and "100% medical coverage." The method for providing her medical expenses was to be "worked out." Mr. Brawer agreed to pay child support of $50,000 a year for each of their two children. He would provide medical insurance for the children and be responsible for all of their uninsured medical *793 expenses. He would pay for the children's summer camp expenses, for private school if private schooling was "necessary," and for their college expenses. "College expenses" was specifically defined to mean tuition, room, board, books, fees, and transportation for five round trips a year. Support payments which had been made under a pendente lite order would not be taxable to Ms. Brawer and would not be deductible by Mr. Brawer. If these payments turned out to be taxable to Ms. Brawer, Mr. Brawer would compensate for the tax by increasing the amount of child support.
Mr. Rubin's notes also reflect that Mr. Brawer undertook to provide "life insurance." Mr. Rubin testified that Mr. and Ms. Brawer agreed that she and their children would be the beneficiaries of the insurance and that their accountants would decide the amount; if they could not agree, Mr. Rubin would make the determination.
Mr. Brawer would retain all of his business interests. Ms. Brawer would get the two cooperative apartments which were the parties' residence, together with the furniture, fixtures and other personalty which they contained. She would receive $1,000,000 cash, payable $350,000 on the "date of settlement on record," i.e., when the divorce judgment was entered incorporating their agreement, and the balance, without interest, payable $150,000 one year later, and $100,000 in five successive annual payments thereafter. "Appropriate security to be agreed upon" would be provided for the outstanding balances, and this obligation would be "non-dischargeable in bankruptcy." Each party would retain the jewelry in his or her possession. Ms. Brawer would be responsible for a $285,000 loan from her father, and Mr. and Ms. Brawer would each receive one-half of their interest in Continental Wingate, a limited partnership.
The agreement as recorded and testified to by Mr. Rubin also included these additional items. Mr. Brawer was to pay Ms. Brawer $30,000 toward her credit card liabilities, reimburse her for four first class airplane tickets, pay hotel expenses at the Grand Floridian, and give her half of his frequent flyer miles on United Airlines. Each party was to pay his or her own attorneys and experts. Mr. Brawer was to pay Mr. Rubin's bill. In the event of any subsequently filed court proceedings, the non-prevailing party would pay all costs of both parties. Mr. Brawer was to pay for the children's Hebrew school and Bat Mitzvah expenses. To replace an automobile lease that would soon expire, he would pay for a four-year lease of an automobile comparable to the vehicle she was currently leasing, but she would be responsible for insurance on the automobile. Mr. Brawer's payments for the lease were not to be taxable to Ms. Brawer or deductible by him.
Mr. Kaufman testified that the parties also agreed about custody and visitation, but Mr. Rubin did not testify about those issues and there is no reference to them in his notes.
Mr. Rubin testified that when all the agreed terms had been recited and he had made his last note, "Everyone, the attorneys, were congratulatory to one another, to me, and they packed up shortly thereafter and left." Mr. Brawer did not say anything at the meeting, either agreeing or disagreeing with Mr. Rubin's statement of the settlement. Mr. Kaufman testified that he congratulated Ms. Strober, said to her and Mr. Rubin, "I never thought we'd get here, but we've gotten here," and shook hands with Mr. Brawer. Neither Mr. nor Ms. Brawer was asked, at least not aloud, whether he or she agreed to the settlement and considered it fair. Mr. Rubin testified that he did not suggest the attorneys pose such questions to their clients because he was tired and the hour was late and because there were details still to be finalized. When pressed, Mr. Rubin attributed more importance to the latter factor than to the former. The open matters were the amount of insurance on *794 Mr. Brawer's life that would be provided to Ms. Brawer, how full payment would be assured for Ms. Brawer's medical expenses, and what form of security would be provided for her for the balance, payable over five years, that would be owed to her on account of her share of equitable distribution.
Mr. Brawer's testimony was not consistent with that of the other witnesses. He told the court that his intention in attending the November 27, 1995 meeting was to discuss a proposed settlement and, at the end of the discussion, to relate the discussion to his father, with whom he was associated in business, and to his company's chief financial officer "and see if there was something we could do to achieve what was discussed." He denied that there was "a full and complete settlement of all of the issues between" him and his wife on November 27, 1995. Contrary to Mr. Rubin's testimony, he claimed that as he and Mr. Rubin were leaving Mr. Rubin's office, Mr. Rubin said to him, "[I]t looks like we may have a deal" and he replied, "[N]o, we don't."
Mr. Brawer told the court that he "could not have entered into a binding agreement without the consent of [his] father and [his] CFO [chief financial officer] because they handle all the finances." But he did not ever tell that to Mr. Rubin or to Ms. Brawer, her attorney or her accountant. In a September 1995 letter to Mr. Rubin, which was copied to Mr. Kaufman, Mr. Brawer's attorney wrote that Mr. Brawer's father had relinquished day-to-day control of the business to his son and had retired. Mr. Brawer admitted that his father had short-term memory loss. A document was introduced giving Mr. Brawer a power of attorney for his father, but Mr. Brawer nonetheless insisted that he continued to consult his father about all business matters, including day-to-day business affairs, and that his father controlled the finances.
When the court asked Mr. Brawer, "[D]o you remember that you were willing to pay 100,000 in child support and she wanted 115,000," he replied, "I wasn't willing to pay it. I was, again, discussing." He agreed, however, that the numbers that they were discussing were $100,000 and $115,000, and, a little later in his cross-examination, he agreed that at about 6:00 p.m. he was willing to pay $100,000 in child support and his wife wanted $115,000. He also admitted that, as Mr. Rubin was making his notes at the end of the day, somebody said "$150,000 in alimony" and that the amount of child support was $100,000, allocated $50,000 to each child. He also conceded that everything in Mr. Rubin's notes must have been discussed and he said that he remembered "the big numbers." He heard Mr. Rubin, his wife and his wife's attorney "go through the terms" of what all of them thought was an agreement, and he conceded that those were the numbers that were reached by the end of the day. Ultimately, he admitted that Mr. Rubin's notes were generally accurate except that, Mr. Brawer claimed, he had not actually agreed to the terms.
The trial judge rejected most of Mr. Brawer's testimony as incredible. But she accepted his contention that, secretly, he did not consider himself bound by the settlement agreement:
Based on [Mr. Brawer's] testimony and the usual practice in matrimonial settlements I find that he entered into negotiations with [Ms. Brawer] believing that he would not be bound by any verbal agreement unless he at least indicated verbally that he was bound by the agreement, or unless he was informed that he would be bound by the agreement, or unless he signed a written agreement or placed an oral agreement on the record in court. I find that he intentionally and in bad faith engaged in settlement negotiations believing that he would be able to determine what plaintiff's bottom-line financial settlement position was without being bound by his offers at that time.
The court found that the attorneys had not asked whether the parties recognized that *795 they were bound by the agreement because the agreement was "not finalized."
Ms. Brawer argued to the trial judge that "a matrimonial settlement contract is like any other contract, and if the parties tacitly agree on essential terms of the contract they have created an enforceable contract." Citing numerous cases holding that matrimonial contracts are subject to different rules, the judge defined "the central question" of the case as follows:
[I]f two parties acquiesce to a verbal divorce settlement, is it enforceable or must the divorcing parties personally acknowledge that they will be bound by the agreement and that they are entering into it voluntarily?
This statement of the issue by the trial judge implicitly recognizes that if this settlement is subject to the same rules of enforceability as the settlement of a non-matrimonial matter, the Brawer's entered into an enforceable settlement. During oral argument before us, Mr. Brawer's attorney agreed that if we were dealing with a commercial contract, the settlement would be valid and enforceable. We concur. The objections to the enforceability of the settlement in this case, other than that it involves a matrimonial controversy, are that issues remain which have not yet been finally disposed of; that Mr. Brawer secretly intended not to be bound without a signed document, testimony in open court, or some other formal indication of assent; and that Mr. Brawer did not expressly manifest agreement to the settlement. For the following reasons, we conclude that none of these objections are valid.
It is evident from the testimony that if there were any disputes between Mr. and Ms. Brawer about custody and visitation, they were not settled at the November 27, 1995 conference. But there is no indication that the parties attempted to settle any such issues at that conference. Mr. Rubin and the parties' accounting advisers would have had no role to play in resolving them. There is no evidence that any settlement negotiated on economic issues was contingent on settling disagreements about custody and visitation. We conclude, as the trial judge also implicitly did, that the economic issues were settled independently of any disputes about custody or visitation. The existence of disagreements on those matters is irrelevant to the enforceability of the November 27, 1995 settlement agreement.
There were details of the economic arrangements which still had not been "finalized." They were the amount of life insurance, how to provide for Ms. Brawer's medical expenses, and how to secure future payments on account of equitable distribution. But the settlement provided a mechanism for fixing the amount of life insurance-the Brawers' accountants would decide, and, if they could not agree, Mr. Rubin would decide. Mr. Brawer was left free to provide any reasonable security for unpaid balances due on account of an agreed amount of equitable distribution and any reasonable mechanism for assuring full payment of Ms. Brawer's medical expenses. Consequently, the absence of agreement on these details was immaterial because they would not have prevented implementation of the agreement. See Harrington v. Harrington, 281 N.J.Super. 39, 46, 656 A.2d 456 (App.Div.), certif. denied, 142 N.J. 455, 663 A.2d 1361 (1995); Bistricer v. Bistricer, 231 N.J.Super. 143, 149, 555 A.2d 45 (Ch.Div.1987).
Mr. Brawer's unexpressed intent not to be bound is also immaterial. Any other participant in the settlement conference would reasonably have inferred from what was said and done at the conference that there was an agreement on the terms of a settlement. As the trial judge implies in her opinion and indicated by her comments during the course of Mr. Brawer's testimony, he intended the other participants to understand that an agreement was being hammered out and that a settlement was being reached. His objective manifestations of intent are sufficient and *796 controlling. Leitner v. Braen, 51 N.J.Super. 31, 38, 143 A.2d 256 (App.Div.1958) (stating that an expressed intent, and not the "so-called real intent of a party" controls). "A contracting party is bound by the apparent intention he or she outwardly manifests to the other party. It is immaterial that he or she has a different, secret intention from that outwardly manifested." Hagrish v. Olson, 254 N.J.Super. 133, 138, 603 A.2d 108 (App.Div.1992); see also Tung v. Briant Park Homes, Inc., 287 N.J.Super. 232, 239, 670 A.2d 1092 (App. Div.1996).
If the dispute among the parties to this case concerned anything other than matters ancillary to a divorce, their conduct would have resulted in an enforceable settlement. The remaining question is whether something more was required to settle this case than to settle a non-matrimonial controversy.
It is true, of course, that a property settlement agreement between spouses is enforceable only if it is completely voluntary, fair and equitable. Lepis v. Lepis, 83 N.J. 139, 148, 416 A.2d 45 (1980); Schlemm v. Schlemm, 31 N.J. 557, 581-82, 158 A.2d 508 (1960). It is therefore subject to amendment by the court when changed circumstances make its enforcement inequitable. Lepis, supra, 83 N.J. at 148-49, 416 A.2d 45; Smith v. Smith, 72 N.J. 350, 362, 371 A.2d 1 (1977). In the present case, however, Mr. Brawer stipulated on the record that he was abandoning any contention that the settlement was unenforceable because it was unfair or inequitable. He argues only that the settlement is unenforceable because there was no agreement. But once issues of equity have been removed from the case, the enforceability of this settlement agreement is subject to the same standards as that in any other case. See Berkowitz v. Berkowitz, 55 N.J. 564, 569, 264 A.2d 49 (1970); Harrington, supra, 281 N.J.Super. at 46, 656 A.2d 456; Rolnick v. Rolnick, 262 N.J.Super. 343, 351, 621 A.2d 37 (App.Div. 1993). We hold that, judged by those standards, an enforceable settlement agreement was reached on the terms which Mr. Rubin summarized in his notes and explained in his testimony at the trial.
Mr. Brawer's argument that he should not have been required to pay Mr. Rubin's entire fee is without merit. His remaining arguments are moot.
Our disposition of this appeal will affect the award of attorneys' fees. We therefore vacate the award and direct the trial court to reconsider the amount of fees allowed to Ms. Brawer in the light of this opinion.
The judgment appealed from is reversed and the case is remanded to the trial court for further proceedings not inconsistent with this opinion.