889 A.2d 462 (2006)
382 N.J. Super. 376
Karin E. LEHR, Plaintiff-Respondent,
v.
John AFFLITTO, Defendant-Appellant.
Superior Court of New Jersey, Appellate Division.
Argued November 2, 2005.
Decided January 19, 2006.
*463 John Afflitto, appellant, argued the cause pro se.
William M. Laufer, Morristown, argued the cause for respondent (Laufer, Knapp, Torzewski & Dalena, attorneys; Kimberly N. Gronau, on the brief).
Before Judges STERN, FALL and GRALL.
The opinion of the court was delivered by
FALL, J.A.D.
In this matrimonial action, defendant John Afflitto appeals from a decision issued by the Family Part on July 9, 2004, enforcing a purported settlement reached during a court-ordered mediation session, after a plenary hearing conducted in accordance with Harrington v. Harrington, 281 N.J.Super. 39, 656 A.2d 456 (App.Div.), certif. denied, 142 N.J. 455, 663 A.2d 1361 (1995),[1] pursuant to our remand in Lehr v. Afflitto, A-6412-02T2 (May 7, 2004).
After reviewing the record in the light of the written and oral arguments advanced by the parties, we conclude that the trial court erred in permitting the mediator to testify as he did during the plenary hearing. We also determine that the credible evidence adduced at the hearing does not support the trial court's conclusion that the parties had reached an agreement and settlement of the issues in their matrimonial litigation. Therefore, we reverse and remand the matter for trial. The following informs our decision.
Plaintiff Karin E. Lehr and defendant were married on March 29, 1980. Two children were born of their marriage: Justin, on April 15, 1986; and Sara, on June 11, 1991. On January 10, 2002, plaintiff filed a complaint for divorce against defendant. Defendant filed an answer and counterclaim for divorce on May 21, 2002.
On December 18, 2002, the parties appeared before the matrimonial Early Settlement Panel, see R. 5:5-5, and were ordered to attend mediation through the Morris County Economic Mediation Pilot Program pursuant to R. 1:40-4(a) with mediator Sanford Kahan, an attorney. See Pressler, Current N.J. Court Rules, Appendix XIX, "Guidelines For Pilot Program Mediation Of Economic Aspects Of Family Actions" (2006). The December 18 order provided, inter alia, that:
5. Upon termination of the mediation process, the mediator shall promptly report to the Court in writing whether or not the case is settled. If the case is not fully settled, then the mediator shall provide to the Court a written summary of which issues are settled and which issues remain open within 14 days.
6. Unless otherwise agreed by the parties, and subject to R. 1:40-4(b) and paragraph 5 of the within Order, all mediation proceedings shall be confidential and nonevidential. No verbatim record shall be made thereof.
[Emphasis added.]
On February 10, 2003, the parties attended their first mediation session with Kahan; no settlement was reached. After two scheduled court appearances and subsequent adjournments, the matter was ultimately scheduled for a case management conference in the Family Part for July 1, 2003.
*464 Prior to the scheduled conference, the parties attended their second mediation session with Kahan on June 17, 2003. Counsel for both parties attended the first two hours of mediation, but left before the last hour of the session. The dispute between the parties here is whether a binding settlement agreement was reached as a result of the mediation process.
Following the second mediation session, Kahan wrote a letter to counsel for both parties dated June 19, 2003, stating the following:
As you are aware, subsequent to our meeting on June 17, 2003 I met briefly with your respective clients in order to finalize an agreement in this matter.
As a result of our meeting, the vast majority of this case [is] now resolved. Unfortunately, time constraints did not permit me to "tweak" several remaining items. However, I believe that the remaining items can be resolved either by discussion of counsel, or if necessary, a short meeting between myself and your respective clients.
Below is an outline of the resolution of this case. My understanding is that [plaintiff's attorney] will prepare a Property Settlement Agreement incorporating this outline. Once the Agreement is drafted, I leave it to counsel to determine if you wish to tweak the remaining items or if you wish for the clients to return to me for that purpose.
Kahan then listed the thirteen items that "the parties have agreed" upon. Kahan's letter went on to state:
As I previously indicated, my time with the parties was short. We did spend quite a bit of time quibbling over various credits and payments. Therefore, there are three items that have been left open which I discuss below. In my discussions, I have made "recommendations" as to how the parties may wish to resolve these issues.
Kahan then listed the three disputed items along with his recommendations for resolution. The unresolved matters were the amount of defendant's child support obligation; the parties' financial responsibility for their children's college education expenses; and the allocation between the parties of interim marital expenses up until entry of the judgment of divorce.
Kahan did not contact the court following the mediation session to report "whether or not the case is settled," as provided by paragraph 5 of the December 18, 2002 order.
Believing that the mediation session had resulted in a settlement, plaintiff's counsel wrote to the court by letter dated June 30, 2003, and advised that
the parties have successfully completed mediation, which has resulted in the settlement of this matter. A Memorandum of Understanding is in the process of being circulated to all parties for final review and consideration. I anticipate being able to prepare a Property Settlement Agreement in accordance with the terms specifically set forth in the Memorandum of Understanding within the next few weeks.
Plaintiff's counsel further requested "that the matter be rescheduled as an Uncontested hearing in August 2003." Defendant's attorney received a copy of the letter but did not respond. Accordingly, the scheduled July 1, 2003 case management conference was adjourned, and the matter was scheduled for an uncontested divorce hearing on July 17, 2003. Again, there was no response from defendant's attorney.
Several days after the June 17, 2003 mediation session, defendant verbally informed plaintiff "that he [had] changed his *465 mind" in regard to the settlement agreement. According to defendant, "after reviewing and considering the proposed settlement terms ... [he] determined that the terms set forth [in the mediator's June 19, 2003 letter] were not agreeable to him as he considered them unfair and not in his best interests." Defendant contended he had the right to reject the proposed settlement terms according to the rules set forth by Kahan that there would be no binding settlement between the parties until there was a signed property settlement agreement.
On July 8, 2003, defendant's attorney wrote to counsel for plaintiff and advised that defendant "does not accept the terms and conditions set forth in the letter from Sanford Kahan, Esquire dated June 19, 2003 regarding possible settlement terms of this matter.... Accordingly, this matter is no longer uncontested." The letter also advised that defendant was "willing to return to mediation" to settle the matter. Although the letter notes a copy thereof was sent to defendant and Kahan, unfortunately, a copy was not sent to the court.
By letter to the court dated July 15, 2003, plaintiff's attorney requested that a case management conference be scheduled, stating that defendant "no longer accepts the terms he previously agreed to." Counsel advised that the divorce was now contested and that plaintiff was "no longer comfortable with the mediation process and does not wish to incur additional legal fees to re-mediate an agreement in the hopes that the defendant will not again rescind his agreement[.]" Defendant's attorney did not respond to that letter.
On July 17, 2003, plaintiff, her attorney and defendant's attorney appeared in the Family Part. Defendant did not appear, believing, as did his attorney, that the court event scheduled for July 17 was a case management conference that did not require his appearance.
The judge stated that since the court had been advised by plaintiff's counsel that the matter had been settled, the divorce was going to be put through as an uncontested matter, regardless of any subsequent changes. Although the judge had received the July 15, 2003 letter from plaintiff's counsel stating that the matter was no longer uncontested, the judge ruled it had been the defendant's responsibility to inform the court that there was no settlement in the matter. The court denied the request of defendant's attorney for a Harrington hearing to determine whether the parties had entered into a binding agreement.
Defendant's counsel argued that the parties had been advised by Kahan that there would be no binding agreement "until a full property settlement agreement was written by counsel ... with the understanding that we were going to review it with our clients and both parties had the ability to make a final decision whether this preliminary understanding was going to be accepted by the parties." Counsel advised the court that "[u]pon review of the memorandum of understanding my client cannot and does not and will not accept the terms of that preliminary decision." Furthermore, defendant's attorney argued that
the terms of mediation are to be confidential and non-evidentiary. [The] memorandum was written up during ... the course of mediation and was for mediation purposes only. So requiring the parties to move forward on an uncontested divorce hearing based on this memorandum of understanding is a violation of the court ordered mediation.
Defendant asserted that his privacy and due process rights were being violated, since he was not being given "ample notice *466 to defend" or the "appropriate opportunity to be heard."
Over the objection of defendant's attorney, the trial court entered a judgment of divorce, incorporating the terms of Kahan's letter dated June 19, 2003, and dismissed defendant's counterclaim due to his failure to appear. The Judgment stated in part:
IT IS ... ORDERED AND ADJUDGED that the Memorandum of Understanding marked as P-1 in evidence constitutes the agreement of the parties. The Court did not take testimony on the agreement but plaintiff testified that she entered into the agreement voluntarily and believed the agreement was fair and equitable. The Court directs the parties to comply with the terms of their settlement as reflected in this document.
On July 31, 2003, defendant filed a notice of appeal from the final judgment of divorce, arguing (1) that the trial court had erred in determining that the letter to the parties from the mediator dated June 19, 2003 constituted the parties' agreement, as it was not an enforceable contract, (2) that the judge had improperly denied his request for a Harrington hearing, and (3) that public policy considerations of confidentiality underpinning the mediation process prohibited the enforcement of the purported agreement, requiring that the judgment be reversed.
In our opinion issued on May 7, 2004, we found a "legitimate question as to whether there was an agreement made between the parties, particularly given defendant's understanding of the nature of the mediation process and the understandable belief that all proceedings would be confidential and non-evidential, and that the attorneys would draft the ultimate Property Settlement Agreement." Lehr, supra, slip op. at 9. Accordingly, we remanded the matter for a Harrington hearing to establish whether the parties agreed on the essential terms of the settlement. Ibid.
On June 17, 2004, the Family Part conducted a plenary hearing to determine whether the parties had a meeting of the minds regarding the settlement terms during mediation. Defendant called Kahan as his first witness, prompting the following colloquy between the court, William M. Laufer as counsel for plaintiff, and Rebecca Grather as counsel for defendant:
MR. LAUFER: Your Honor, I'm going to object to Mr. Kahan testifying in this matter based upon Rule 1:40-4, setting forth the general rules governing the mediation process. I think for Mr. Kahan's point, if no one else's, he should be concerned about testifying in these proceedings, unless certain requirements are met.
* * * *
THE COURT: Okay. And what about that rule would prohibit the mediator 
MR. LAUFER: Well, it's the issue of confidentiality of the process. And that rule specifically says that no mediator may participate in any subsequent hearing or trial of a mediated matter, or appear as a witness or counsel for any person in the same or any related matters. Now, there are exceptions to that rule.
THE COURT: Okay. And ... can you make a proffer of the kinds of questions you will be asking Mr. Kahan?
MS. GRATHER: Yes, Your Honor. First of all, Mr. Kahan is here under subpoena, he's not here on behalf of Mr. Afflitto. I issued a subpoena which was duly served and a copy was forwarded to Mr. Laufer. If Your Honor would like a copy of that subpoena, I'd be happy to supply one.

*467 Mr. Kahan is here to testify as to the general tenor of the mediation agreement  the mediation sessions, as to what instructions were given to the parties and his understanding as to whether there was an agreement or not at the conclusion of the last mediation session that occurred. He's not here to testify as to any substance ... of the issues that were discussed.
THE COURT: Well, it's not his opinion as to whether there was an agreement or not, that's not the issue. The issue is as to whether the parties communicated that there was an agreement 
MS. GATHER: To him. So, his understanding as to whether the parties believed 
THE COURT: No, no, it's not to him. He's not the  he doesn't determine that. No. I think he can testify about what he does as a mediator and the parameters under which he operates. How a mediator conducts the mediation. And if he is able to tell us, from notes or whatever, expressly what he did in this particular case in accordance with his efforts to mediate this. He can indicate at the very end that he prepared a memorandum of understanding, but I don't think he should get into his understanding because his understanding doesn't mean anything.
MS. GRATHER: Unless of course 
THE COURT: He may have thought that there was a settlement, it may have fallen apart after that. So, ... what his... opinion is, I do not believe, is relevant.... I believe that he should be able to address how he conducted this session of mediation, what he advised the individuals as to what he was going to do, what the process was and where it would go from there. So, if you limit the questions to that, I think we would be okay. Do you have 
MS. GRATHER: Your Honor, except 
THE COURT:  any objection to that, Mr. Laufer?
MR. LAUFER: That seems fair, Judge.
THE COURT: Okay.
MS. GRATHER: Your Honor, except that it would also be relevant if Mr. Afflitto or Ms. Lehr said I accept or I reject those terms to Mr. Kahan during the course of the mediation.
THE COURT: As I said, I'm not sure how it is. I'll think about that before I let you get Mr. Kahan off the stand because again, as I said, they may have told him that either  just for example, just as a hypothetical, he may have said to Mr. Kahan, I accept this settlement. He may then have spoken to you and as a result of the conversations, he may have said, you know something, I don't think that this is a  I'm not happy with this.
Therefore, the fact that he may have, at one time, said something, is something that shouldn't be communicated to the court. It's almost like people in any case, in negotiating, until they advise the court that there is a settlement, then anything that occurred before then is not evidential to show whether or not there was a settlement.
So, ... let me think about it, as he testifies about the other issues, but I'm pretty sure that I will not allow you to ask that question. Okay?
MS. GRATHER: Your Honor, I'd just ask you to consider also, when you're considering this issue, Ms. Lehr has stated that she believes there was an agreement, so the next question 
THE COURT: Please, do me a favor. You have a witness here, please have the witness testify. Please do not make argument in the middle of the case.

*468 You called a witness. There was an objection to the witness testifying about certain issues. I indicated the parameters under which the witness would testify and I indicated before you finished, I would think a little bit more about whether I will allow you to ask that question or whether that, in itself, would be something that would be confidential. It's all negotiations. All negotiations are confidential and they are not evidential at time of trial.
So, considering however that this is a Harrington hearing, I'm still not sure that he should be asked that question, because that's not the issue. Things can change. It's more a settlement isn't really a settlement until it is conveyed  until the parties sign something or until it's conveyed to the court.
So, if you'd just ask him the questions about the procedure.
MS. GRATHER: Thank you, Your Honor.
Upon questioning by defendant's counsel, Kahan testified that he had informed the parties in the beginning and the end of the mediation session that the mediation was confidential and that "no court will know what went on in this mediation ... until there's a written, signed agreement" and that "there is no agreement until they've had a chance to review any agreement with counsel and until there's a signed property settlement agreement."
Defendant's counsel offered into evidence the June 19, 2003 letter that Kahan had issued to counsel for the parties. There was no objection by plaintiff's counsel, prompting the following additional colloquy:
THE COURT: I have a question. Where does  I have actually two questions, and I'm sorry  Mr. Laufer, you'll have an opportunity to cross examine.
First question, if you tell the parties that everything that goes on is confidential, how do you segregate out a letter to counsel? Why is that not confidential as well? Is there  are there any rules or regulations that control how a mediator handles a particular matter in conveying  in other words, everything is confidential. Now, you are writing a letter to the parties' attorneys. Do they give you the authority to write that letter? Do they understand that that letter is being submitted? Is that an exception to the confidentiality? I mean, where do you draw the line?
MR. KAHAN: My understanding, Your Honor, is that the attorneys are part of the mediation. The court order indicates that attorneys shall be present. So, they're part of the mediation process. Anything 
THE COURT: Were they present at the mediation sessions?
MR. KAHAN: In this mediation, the first session, yes. The second session, they were there for approximately the first two hours, but not for the last hour or so.
THE COURT: Okay. So, why would you then need to send a letter to counsel? If counsel is involved in the mediation, why would you not just have the parties communicate to their attorneys? I'm trying to figure out where you draw this line.
MR. KAHAN: Sure. In ... the process, it's this case, but other cases as well, so I can speak generally. We go through a lot of issues, discuss a lot of things. In this particular case, a lot of issues were discussed. After counsel left, some issues were discussed again and tweaked.... So that my letter is a summary to counsel, in furtherance of the mediation, so they knew what occurred, so that they can ... then go *469 draft an agreement, based upon the discussion. In other words, everyone has different notes. So this is my summary.
* * * *
THE COURT: What does that mean, "your understanding of where you left the mediation"? What was discussed and what ... issues still needed to be resolved or what issues ... the parties had communicated to you?
MR. KAHAN: The first. What had been discussed, what we had agreed to, but agreed, I say, in small "a," not capital "A."
THE COURT: I don't understand what a small "a" or capital "A" is.
MR. KAHAN: Small "a." Your Honor, that gets to the issue of  as to my understanding of whether or not there was an agreement. And I don't know that you want me to testify to that.
THE COURT: Okay. But ... you're going to have to explain to me what a capital "A" and a small "a" [is].
MR. KAHAN: Capital "A" in my mind means a written signed or  an agreement with offer/acceptance in the legal sense.... As opposed to an agreement that the parties conceptually agreed to.
* * * *
THE COURT: Well, considering this is a Harrington hearing, and considering that Ms. Grather ... has marked this exhibit, the letter of Mr. Kahan, as D-2, and considering that she wants, I would assume, this letter to go into evidence  Mr. Laufer is not objecting to this letter, and considering that Mr. Kahan has been asked to explain or discuss parts of this letter, are both sides waiving any argument regarding confidentiality in a mediation proceeding?
Because I'm terribly confused right now, because as I understood it, one of the arguments raised at the Appellate Division, was that all of this was confidential and therefore it should be held in [confidence] and nobody should address it in court.
I'm not sure that you need to go through this to decide whether or not there was a settlement, but if you're going to introduce this letter and if you want to question Mr. Kahan, ... I want it very clear from counsel here that you are, in essence, waiving any issue regarding confidentiality of what happened... in the whole mediation process.
I want you to think about it. Because this is pretty significant.
After additional discussion concerning the scope of Kahan's testimony, both counsel stated they were willing to stipulate that the thirteen issues specified therein by Kahan's letter had been the subject of the mediation process; that plaintiff's position was that a binding agreement had been reached as to those items; and that defendant's contention was that those items were under consideration, but were not binding because they were subject to further discussions. Counsel also stipulated the three other items specified in Kahan's letter "were left open for further discussion/mediation." Mr. Laufer stated that "with those stipulations, I would have no objection to [Kahan's letter] going into evidence." (Emphasis added). Notwithstanding the scope of the stipulations, the court ruled that "at this point, ... any questions that are asked, and any responses that are elicited, are deemed to be a waiver by Mr. Afflitto to any objections to matters at mediation being brought before the court."
On direct examination, Kahan consistently testified that the letter he wrote to the parties' attorneys did not constitute a binding settlement. When asked whether *470 he had finalized a binding agreement with the parties, notwithstanding the language in his June 19 letter that "[t]he parties have agreed as follows[,]" Kahan replied "No." On cross-examination, Kahan testified that the holding in Pascarella v. Bruck, 190 N.J.Super. 118, 462 A.2d 186 (App.Div.1983), that a verbal agreement can be binding between parties, is applicable in some circumstances. However, Kahan stated that he does not tell parties to a mediation that they can be bound by their verbal agreement. He asserted that if the parties shake hands and agree to be bound by their verbal agreement before a property settlement agreement is written and signed, he makes it "very  very clear" that there is a deal and there is no backing out. He testified on re-direct that he did not recall the parties in this matter shaking hands and saying there was a deal.
Kahan explained that when he used the phrase "the parties have agreed as follows" in his letter, it meant that the parties have agreed to those concepts in mediation, and that they have the right to review it with counsel, even though he did not expressly state that in his letter. He also clarified that the thirteen items referenced in his letter were resolved, subject to review by the parties' attorneys. Kahan recalled discussing with the parties and attorneys how they were planning to call the court for an uncontested hearing date; however, he did not recall that a settlement was reached. Kahan further testified to his understanding that when the court is called to schedule an uncontested date, it means that the parties will have the case finalized before it gets to court.
Rebecca M. Grather was questioned regarding her involvement in the mediation sessions as attorney for defendant. Grather testified that the mediator had instructed the parties numerous times that nothing would be final unless mutually agreed upon. Grather recalled that "although Mr. Kahan's correspondence indicates that I would prepare the property settlement agreement, it was my understanding that we had agreed that Mr. Laufer was going to prepare an agreement for the parties to take into consideration," meaning that it would be circulated for review.
Grather stated that she left the mediation session early, missing the last hour, and that the next contact she had with plaintiff's counsel was one or two days before July 1, 2003, the day of the scheduled case management conference. Grather testified that they spoke about the upcoming conference and that they had "hoped to sign a property settlement agreement and put through an uncontested [divorce]."
Grather stated that some time after the second mediation session, she had a telephone conversation with plaintiff's counsel and said that her client "does not accept this deal that we have been discussing." Prior to that conversation, no one had prepared a property settlement agreement. Grather testified that she did not inform the court that there was no deal because plaintiff's counsel indicated he would do so. When she went to the hearing on July 17, 2003, Grather said that her client was not present because she thought that the matter had been converted to a case management conference, in accordance with the request by plaintiff's counsel in his July 15, 2003 letter, and did not believe her client's appearance was necessary. Grather asserted that she never indicated to plaintiff's counsel that a binding settlement had been reached.
Defendant testified that during the June 17 mediation session, Kahan had stated several times in the beginning and end of the session that the parties would not be bound until a memo was circulated and *471 signed by both parties. Defendant stated that he never received such a document, and thus contended no binding agreement had been reached.
William M. Laufer was questioned regarding his involvement in the mediation sessions as attorney for plaintiff. He asserted that, "I can honestly say that when we left there that day, we had an agreement on the major issues. Both counsel and I agreed that it was a settlement. We agreed to it in the presence of our respective clients. And we left the office that day with an agenda." Laufer testified that he had not prepared the property settlement agreement because he went away on vacation and when he returned, he saw Grather's July 8, 2003 letter advising him that defendant had changed his mind and was contesting the divorce.
Plaintiff testified that during the second mediation session she, defendant and their attorneys had discussed the issues and came to an agreement on them, but had left a few issues outstanding. She asserted that before the attorneys left everyone shook hands and decided to put through an uncontested divorce. Plaintiff further testified that she felt that the terms the parties discussed at mediation became binding on them when the mediation session ended for the day. Plaintiff stated she was aware at the outset of the June 17, 2003 mediation session that defendant had been fired from his job since they had last mediated, on February 10, 2003. Plaintiff testified she became aware that defendant did not agree to the settlement terms on July 7, 2003, when he spoke to her and informed her, "I changed my mind."
At the conclusion of the plenary hearing, the trial judge ruled that there had been a meeting of the minds in regard to the thirteen issues; thus the parties had agreed to be bound by them. The court found that "the language in the mediator's letter ... strongly implies that there was an agreement and the agreement was to be reduced to writing." The judge found that "[i]t was clear that the mediator believed his efforts were successful." The judge was convinced that an agreement had been reached, but that defendant had subsequently changed his mind, deciding that the agreement was unacceptable. The judge stated that "[i]f there had been no agreement, he wouldn't have had to communicate to anyone that the agreement was unacceptable." Therefore, the judge found that there had been a meeting of the minds, and ordered that the thirteen terms outlined in Kahan's letter be reduced to a writing that accurately reflected their agreement.
On appeal, defendant argues that the trial judge erred in affirming the judgment of divorce; that he should not be bound by the terms of the June 19, 2003 letter from the mediator since it was merely a "preliminary understanding" between the parties; and that the court erred in finding that the parties had a meeting of the minds in regard to thirteen issues at mediation and incorporating the terms of the mediator's letter into the judgment of divorce.
Defendant asserts that Kahan's June 19, 2003 letter to the parties' attorneys was confidential and should not have been used by the court at the July 17, 2003 hearing to serve as the settlement terms between the parties. We agree.
After carefully reviewing the record of the June 17, 2004 plenary hearing, we cannot conclude that the mediation confidentiality provisions, and the restriction that "[no] mediator may participate in any subsequent hearing of the mediated matter or appear as a witness ... for any person in the same or related matter[,]" as set forth in R. 1:40-4(c), had been effectively *472 waived. At the outset of the plenary hearing, plaintiff's counsel had cited to R. 1:40-4(c), and objected to any testimony from Kahan. The court then proceeded to set forth what it felt were proper parameters for Kahan's testimony.
When the ultimate question was posed to Kahan as to whether he believed that the parties had reached a settlement of the thirteen issues set forth in his June 19, 2003 letter, the parties conferenced and reached a stipulation that did not encompass Kahan providing an answer to that question. However, the court concluded that objections to any questions asked of Kahan concerning the mediation were to be deemed waived. We disagree with that conclusion, which essentially rendered the stipulation meaningless, since any agreed-upon constraints placed on Kahan's testimony were removed. Kahan was then permitted to answer all questions concerning the mediation process, what transpired with respect to the issue of settlement, and whether he believed the parties had arrived at a binding settlement.
The subpoenaing of Kahan by defense counsel, and the procedures employed here in light of R. 1:40-4(c) are troubling. The issue of the confidentiality of mediation proceedings is a matter of great public and systemic importance. See State v. Williams, 184 N.J. 432, 446-50, 877 A.2d 1258 (2005). Underpinning the success of mediation in our court system is the assurance that what is said and done during the mediation process will remain confidential, unless there is an express waiver by all parties or unless the need for disclosure is so great that it substantially outweighs the need for confidentiality. The mediation process was not designed to create another layer of litigation in an already over-burdened system.
There are several confidentiality restrictions that govern mediation sessions. Paragraph 6 of the December 18, 2002 order specifically provided that "[u]nless otherwise agreed by the parties, and subject to R. 1:40-4(b) and paragraph 5 of the order, all mediation proceedings shall be confidential and nonevidential. No verbatim record shall be made thereof." Additionally, Kahan had specifically informed the parties at each mediation session that the sessions were confidential and "without prejudice, that no Court will know what went on in this mediation, until there's a written, signed agreement." Here, that representation or "condition" of the mediation session should have been honored.
The New Jersey Court Rules also provide for specific restrictions on mediation confidentiality. Appendix XIX thereof contains a section entitled "Guidelines For Pilot Program, Mediation Of Economic Aspects Of Family Actions" which provides that R. 1:40-4 "shall govern the pilot program" if applicable, "as modified and supplemented by these guidelines." R. 1:40-4(c) deals with confidentiality of the mediation process. The relevant parts of the rule state:
Except as otherwise provided by this rule and unless the parties otherwise consent, no disclosure made by a party during mediation shall be admitted as evidence against that party in any civil, criminal, or quasi-criminal proceeding. A party may, however, establish the substance of the disclosure in any such proceeding by independent evidence. ... No mediator may participate in any subsequent hearing or trial of the mediated matter or appear as witness or counsel for any person in the same or any related matter.

[R. 1:40-4(c)(emphasis added).]
Although the now-enacted Uniform Mediation Act (UMA), N.J.S.A. 2A:23C-1 to -13, effective November 22, 2004, was not in effect at the time the mediations sessions *473 or the Harrington were conducted, the Court recognized "that the UMA principles, in general, are an appropriate analytical framework for the determination whether [a party] can overcome the mediator's privilege not to testify." Williams, supra, 184 N.J. at 444-45, 877 A.2d 1258. N.J.S.A. 2A:23C-4a provides that unless one of the exceptions outlined in N.J.S.A. 2A:23C-6 are applicable, or unless waived pursuant to N.J.S.A. 2A:23C-5, a "mediation communication" is privileged and "shall not be subject to discovery or admissible in evidence in a proceeding[.]" A party to mediation "may refuse to disclose, and may prevent any other person for disclosing, a mediation communication[,]" N.J.S.A. 2A:23C-4b(1), and "a mediator may refuse to disclose a mediation communication, and may prevent any other person from disclosing a mediation communication of the mediator." N.J.S.A. 2A:23C-4b(2).
These privileges contained in N.J.S.A. 2A:23C-4 "may be waived in a record or orally during a proceeding if it is expressly waived by all parties to the mediation and: (1) in the case of the privilege of a mediator, it is expressly waived by the mediator[.]" (Emphasis added). N.J.S.A. 2A:23C-6, entitled "Exceptions to privilege," provides in part:
a. There is no privilege under [N.J.S.A. 2A:23C-4] for a mediation communication that is:
(1) in an agreement evidenced by a record signed by all parties to the agreement;
(2) made during a session of a mediation that is open, or is required by law to be open, to the public;
(3) a threat or statement of a plan to inflict bodily injury or commit a crime;
(4) intentionally used to plan a crime, attempt to commit a crime, or to conceal an ongoing crime or ongoing criminal activity;
(5) sought or offered to prove or disprove a claim or complaint filed against the mediator arising out of a mediation;
(6) except as otherwise provided in subsection c., sought or offered to prove or disprove a claim or complaint of professional misconduct or malpractice filed against a mediation party, nonparty participant, or representative of a party based on conduct occurring during a mediation; or
(7) sought or offered to prove or disprove child abuse or neglect in a proceeding in which the Division of Youth and Family Services in the Department of Human Services is a party, unless the Division of Youth and Family Services participates in the mediation.
Clearly, none of these enumerated circumstances were applicable here. The balance of N.J.S.A. 2A:23-6 provides, as follows:
b. There is no privilege under [N.J.S.A. 2A:23C-4] if a court, administrative agency, or arbitrator finds, after a hearing in camera, that the party seeking discovery or the proponent of the evidence has shown that the evidence is not otherwise available, that there is a need for the evidence that substantially outweighs the interest in protecting confidentiality, and that the mediation communication is sought or offered in:
(1) a court proceeding involving a crime as defined in the "New Jersey Code of Criminal Justice," N.J.S. 2C:1-1 et seq.; or
(2) except as otherwise provided in subsection c., a proceeding to prove a claim to rescind or reform a defense to avoid liability on a contract arising out of the mediation.
c. A mediator may not be compelled to provide evidence of a mediation *474 communication referred to in paragraph (6) of subsection a. or paragraph (2) of subsection b.
d. If a mediation communication is not privileged under subsection a. or b., only the portion of the communication necessary for the application of the exception from nondisclosure may be admitted. Admission of evidence under subsection a. or b. does not render the evidence, or any other mediation communication, discoverable or admissible for any other purpose.
Although these provisions of the UMA are more elaborate and specific than the confidentiality provisions contained in R. 1:40-4(c), they embody the same underlying principles of public policy. In Williams, supra, 184 N.J. at 441, 877 A.2d 1258, the Court interpreted R. 1:40-4(c) and concluded that under a plain reading of the rule, a mediator is generally prevented from testifying as a witness in a trial or hearing related to the mediated matter. Id. at 441, 877 A.2d 1258. As the Court explained:
Courts have long-recognized that public policy favors settlement of legal disputes, see, e.g., Nolan ex rel. Nolan v. Lee Ho, 120 N.J. 465, 472, 577 A.2d 143 (1990), and that confidentiality is a "fundamental ingredient of the settlement process," Brown v. Pica, 360 N.J.Super. 565, 568, 823 A.2d 899 (Law Div.2001).
* * * *
Successful mediation, with its emphasis on conciliation, depends on confidentiality perhaps more than any other form of ADR. See Foxgate Homeowners' Ass'n, Inc. v. Bramalea Cal., Inc., 26 Cal.4th 1, 108 Cal.Rptr.2d 642, 25 P.3d 1117, 1126 (Cal.2001) ("Confidentiality is essential to effective mediation...."). Confidentiality allows "the parties participating [to] feel that they may be open and honest among themselves. ... Without such assurances, disputants may be unwilling to reveal relevant information and may be hesitant to disclose potential accommodations that might appear to compromise the positions they have taken." Final Report of the Supreme Court Task Force on Dispute Resolution 23 (1990); see also Prigoff, supra, 12 Seton Hall Legis. J. at 2 ("Compromise negotiations often require the admission of facts which disputants would never otherwise concede."). ... Mediation communications, which "would not [even] exist but for the settlement attempt," are made by parties "without the expectation that they will later be bound by them." Prigoff, supra, 12 Seton Hall Legis. J. at 2, 13. Ultimately, allowing participants to treat mediation as a fact-finding expedition would sabotage its effectiveness. See id. at 2 (warning that routine breaches of confidentiality would reduce mediation to "discovery device").
If mediation confidentiality is important, the appearance of mediator impartiality is imperative. A mediator, although neutral, often takes an active role in promoting candid dialogue "by identifying issues [and] encouraging parties to accommodate each others' interests." Id. at 2. To perform that function, a mediator must be able "to instill the trust and confidence of the participants in the mediation process. That confidence is insured if the participants trust that information conveyed to the mediator will remain in confidence. Neutrality is the essence of the mediation process." Isaacson v. Isaacson, 348 N.J.Super. 560, 575, 792 A.2d 525 (App.Div.2002) (interpreting Rule 1:40-4). Thus, courts should be especially wary of mediator testimony because "no matter how carefully presented, [it] will inevitably be characterized so as to favor *475 one side or the other." Prigoff, supra, 12 Seton Hall Legis. J. at 2 (emphasis added); see also In re Anonymous, 283 F.3d 627, 640 (4th Cir.2002) ("If [mediators] were permitted or required to testify about their activities, ... not even the strictest adherence to purely factual matters would prevent the evidence from favoring or seeming to favor one side or the other." (alteration in original) (quoting NLRB v. Joseph Macaluso, Inc., 618 F.2d 51 (9th Cir.1980))); Ellen Deason, The Quest for Uniformity in Mediation Confidentiality: Foolish Consistency or Crucial Predictability?, 85 Marq. L.Rev. 79, 82 (2001) ("If a mediator can be converted into the opposing party's weapon in court, then her neutrality is only temporary and illusory.").
[Id. at 446-448, 877 A.2d 1258.]
Applying these principles and guidelines, we conclude that since there was no express waiver of the confidentiality provisions of R. 1:40-4(c), the trial court erred in permitting Kahan to testify at the Harrington hearing. Even applying the "exception test" set forth in N.J.S.A. 2A:23C-6b of the UMA, or the test for piercing the mediation privilege as articulated in Williams, supra, 184 N.J. at 451-53, 877 A.2d 1258, when balancing the need for the mediator's testimony with the interest in confidentiality, it is clear that the need for Kahan's testimony did not substantially outweigh the private and public interests in protecting confidentiality.
Moreover, even if we were to construe the record on appeal in a manner to find that Kahan's testimony was permissible, the findings of the trial court that the parties had reached a binding settlement was simply not supported by substantial, credible evidence contained in the record. See Cesare v. Cesare, 154 N.J. 394, 412, 713 A.2d 390 (1998) (holding that "an appellate court should not disturb the `factual findings and legal conclusions of the trial judge unless they are so manifestly unsupported by or inconsistent with the competent, relevant and reasonably credible evidence as to offend the interests of justice.'" (quoting Rova Farms Resort, Inc. v. Investors Ins. Co., 65 N.J. 474, 484, 323 A.2d 495 (1974))). Certainly, without Kahan's testimony, the record does not support the conclusion that a binding settlement had been reached.
Kahan, whose credibility was not placed in issue, specifically testified that the parties had been informed that there would be no agreement unless and until there was a writing signed by them. Neither party disputed that. Kahan also stated that a binding agreement had not been attained, which is why he sent the June 19, 2003 letter to the attorneys for the drafting of an agreement.
Furthermore, it was clear and undisputed that an agreement had not been reached as to all issues. In fact, both parties have freely acknowledged that even if there had been an agreement reached on the thirteen issues, three financial issues had not yet been resolved. Specifically, the parties' contribution toward the college costs of the children; the amount of defendant's child support obligation; and the payment of interim marital expenses, all remained contested and unresolved.
Therefore, even if the findings of the judge were to be accepted, by the admission of both parties and from the testimony of Kahan, there was no final, binding settlement as to all outstanding issues in this matrimonial matter. We find this fact significant on the issue of whether a binding settlement had been reached, because financial issues in a matrimonial case are, by their nature, interrelated. *476 See Harrington, supra, 281 N.J.Super. at 49, 656 A.2d 456 (noting that support, alimony and equitable distribution provisions in an agreement are part of a "unitary scheme"). It is clear that "the termination of a marriage involves an `economic mosaic' comprised of equitable distribution, alimony and child support and ... these financial components interface." Koelble v. Koelble, 261 N.J.Super. 190, 192, 618 A.2d 377 (App.Div.1992). See also Lynn v. Lynn, 165 N.J.Super. 328, 342, 398 A.2d 141 (App.Div.) (noting the necessary interrelationship between property distribution, alimony and child support), certif. denied, 81 N.J. 52, 404 A.2d 1152 (1979).
This interrelationship among the various financial issues in a matrimonial case is best illustrated by the overlapping factors that a court must consider when determining issues of alimony, see N.J.S.A. 2A:34-23b; equitable distribution, see N.J.S.A. 2A:34-23.1; and non-guidelines child support, see N.J.S.A. 2A:34-23a. All three statutory provisions require an analysis of the financial circumstances of the parties, including consideration of the amounts of support required and the equitable distribution ordered. Similar financial factors must be considered when determining an application for counsel fees, see R. 5:3-5(c), and contributions toward the higher-educational costs of children of the marriage, see Newburgh v. Arrigo, 88 N.J. 529, 545, 443 A.2d 1031 (1982). The interrelationship of these issues is irrefutable based on the reality that the amount of income, assets and other financial resources in a given case is finite and must be allocated among the various competing needs. Stated simply, the settlement of one financial issue can have a marked effect on how another financial issue is settled.
Plaintiff's reliance on our opinion in Brawer v. Brawer, 329 N.J.Super. 273, 747 A.2d 790 (App.Div.), certif. denied, 165 N.J. 138, 754 A.2d 1214 (2000), is misplaced. There, we held that the parties had reached an enforceable settlement of the economic issues ancillary to their divorce, even though there were some details that had to be finalized. Id. at 275, 747 A.2d 790. However, there, the parties' settlement provided for a mechanism for resolving those unresolved items. Id. at 283, 747 A.2d 790. "Consequently, the absence of an agreement on these details was immaterial because they would not have prevented implementation of the agreement." Ibid. Not so here, where there was no agreed-upon mechanism to resolve the outstanding issues, and the purported agreement could hardly have been implemented in full without an agreement or resolution concerning the amount of defendant's child support obligation and the allocation of interim marital expenses.
In this connection, we also note that R. 5:7-8 provides:
Bifurcation of trial of the marital dissolution or custody dispute from trial of disputes over support and equitable distribution shall be permitted only with the approval of the Family Presiding Judge, which approval shall be granted only in extraordinary circumstances and for good cause shown.
There were no extraordinary circumstances here that warranted entry of a judgment of divorce that incorporated a purported settlement of thirteen issues, while bifurcating the three other unresolved financial issues for future resolution or adjudication.
In these circumstances we find no utility in vacating that portion of the final judgment dissolving the parties' marriage. However, that portion of the judgment incorporating the purported agreement of the parties is vacated, and the matter is remanded for trial on the issues ancillary to the divorce.
*477 We recognize that this result inordinately delays finality for these parties in their quest  which began nearly four years ago  for a final judgment of divorce adjudicating all issues ancillary to the dissolution of their marriage. The dynamics and costs of a contested divorce take a financial and emotional toll on not only the parties, but their children.
The advent of mediation and other alternative dispute resolution methods as tools to assist parties in resolving their disputes as early as possible and with the least amount of financial and emotional strain is an admirable and worthwhile effort of the court system. Ultimately, however, in an adversarial system with limited resources, the success of mediation is dependent on the good faith, reasonableness and willingness of the litigants to participate. Many are able to do so successfully. However, litigants are not fungible. For one reason or another, some are simply not good candidates for case resolution through good-faith alternative dispute resolution methods such as mediation. Early identification of those who are not is difficult; we have the benefit of hindsight, trial courts do not. Here, the trial court provided these parties with an opportunity to expeditiously resolve their matter without the cost and burden of plowing through the adversarial system to achieve a final result so that they could move on with their lives. That did not happen here. It might be said that, "Nothing quite new is perfect." Marcus Tullius Cicero (106-43 B.C.), Brutus, 71. Accordingly, when this matter is tried and adjudicated, we expect the trial court will evaluate all of the factors enumerated in R. 5:3-5(c) when considering the issue of counsel fees.
Reversed and remanded.
NOTES
[1] In Harrington, we ruled that where there are material issues of fact as to whether parties had reached an agreement, a plenary hearing is necessary. Id. at 47, 656 A.2d 456.