**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-5583-17T3

ROBERT PEPPARD,

     Plaintiff-Respondent,

v.

LORI E. PEPPARD,

     Defendant-Appellant.

_____

        Argued telephonically May 13, 2020 –
        Decided July 17, 2020

        Before Judges Whipple, Gooden Brown and Mawla.

        On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Monmouth County, Docket No. FM-13-0080-17.

        Amy Sara Cores argued the cause for appellant (Cores & Associates, LLC, attorneys; Amy Sara Cores and Anastasia Millicker, on the briefs).

        Karin Duchin Haber argued the cause for respondent (Haber Silver & Simpson, attorneys; Karin Duchin Haber, of counsel; Jani Wase Vinick, on the brief).

PER CURIAM

In this matrimonial matter, defendant/ex-wife appeals from two Family Part orders: (1) a June 29, 2018 order denying her application pursuant to Rule 4:50-1(f) to vacate the term sheet executed on October 31, 2017, and incorporated into the parties' dual judgment of divorce (DJOD) entered on November 6, 2017, in an uncontested divorce proceeding; and (2) a February 28, 2019 order directing the parties to comply with the June 29 order and attend mediation as requested by plaintiff/ex-husband to resolve the outstanding issues stemming from the divorce. We affirm in part and reverse in part.

We glean these facts from the record. The parties divorced after a twenty-four-year marriage that produced two sons, one born of the marriage in May 1996, and one born to defendant in January 1986 from a previous relationship and adopted by plaintiff during the marriage. The older son is emancipated and the younger son is a college student. During the November 6, 2017 uncontested divorce proceeding, a one-page handwritten term sheet executed by the parties and their former attorneys on October 31, 2017, was incorporated into the DJOD. The term sheet was the product of eight months of mediation among the parties, their attorneys, and a forensic accountant jointly retained to conduct a cash flow analysis of plaintiff's income and a valuation of his business.

At the October 31, 2017 mediation session, after several hours of negotiations, the parties agreed to the following terms embodied in the term sheet:

1.    Alimony[:] [Plaintiff] will pay [defendant] $40,000[] per year in alimony for an open duration [and] non-taxable limited duration alimony in the amount of $9,000[] per year for five years.[1]

2.  Equitable Distribution[:]

A.  Marital Residence - [Defendant] will keep the marital residence free from [plaintiff]'s claims, subject to existing debt except the [small business association (SBA)] loan, for which [plaintiff] will be solely responsible.  [Defendant] to re-fi[nance] to remove [plaintiff]'s name.

B.  Compact Sports - [Plaintiff] shall keep his business[,] including Fireball Mountain free from [defendant]'s claims.

C.  Personal Property - [Plaintiff] may retrieve the treadmill[,] the Russian painting[, and] business property.

D.  Counsel Fees - Each to pay own.

3.    College Contribution[:] The parties have an obligation to contribute to [their younger son]'s college education pursuant to [Newburgh v. Arrigo, 88 N.J. 529 (1982)].

---

[1]  The limited duration alimony totaling $45,000 is subsequently referred to by the parties as equitable distribution.

4. Life Insurance[:] [Plaintiff] will obtain insurance sufficient to cover his alimony obligation.

At the November 6, 2017 divorce hearing, the attorneys advised the judge that the term sheet addressed "the bulk of the major terms of an agreement," but "[t]here [were] some minor issues that still need[ed] to be ironed out." The attorneys proposed that the term sheet be incorporated into the DJOD, with "[t]he goal" that a subsequent "final property settlement agreement [(PSA)], containing all of the issues in [the] divorce," including the provisions in the term sheet, would be incorporated into "an amended [DJOD]."

During the ensuing voir dire by their respective attorneys, both parties testified under oath that they were satisfied with their attorneys' representation, and that they signed the term sheet voluntarily, without "force," "threat[s]" or "coerc[ion]." They both requested that the court incorporate the term sheet into the DJOD. They also agreed that the term sheet resolved "the bulk of the terms of [their] divorce agreement," that they "fully underst[ood] all the[] terms," that they were "willing to be bound by [the terms]," and that they "believe[d] the[] terms represent[ed] a fair and equitable resolution of [their] divorce-related matters."

A-5583-17T3

Thereafter, the judge reviewed each provision of the term sheet with the parties. Regarding the alimony obligation, the judge questioned plaintiff about his ability to pay the negotiated amount and "continue to live some type of lifestyle reasonably comparable to what [he] enjoyed during the marriage." Plaintiff responded that his lifestyle would be "a little lower," but he was "able" and "willing" to pay that amount. The judge then asked defendant whether she would be able "to support [herself]" with the negotiated amount, and she responded affirmatively. Without objection from defendant, plaintiff also confirmed for the judge that the open duration alimony would "be taxable to [defendant]."

Upon further questioning by the judge, the parties acknowledged that they understood that "even though [the term sheet was] a piece of paper," the "agreement [was] legally binding" and had the same force and effect as if the issues had been decided by the judge after a trial. The parties also agreed that if they were unable to resolve "th[e] loose ends" in "a reasonable amount of time," the term sheet would still be binding, and the parties would not be able "to change [their] mind[s]." The judge then granted the divorce based on irreconcilable differences, N.J.S.A. 2A:34-2(i), entered the DJOD, and

"incorporate[ed] within th[e] [DJOD] the terms and provisions of [the term sheet]."

In that regard, the judge found:

> The parties have entered into a comprehensive agreement. It is . . . embodied in a written form as a term sheet, which was prepared and agreed upon at . . . a series of economic mediations, which the parties conducted with [their forensic accountant]. . . . It purports to resolve almost all of the collateral issues that are incident to the dissolution of this marriage. I am satisfied that the parties have entered into this agreement freely, knowingly, and voluntarily, each having adequate time to review and consider its contents, and each having been represented by [c]ounsel of her or his own choosing throughout this matter.
>
> The term sheet does . . . leave[] open a few incidental issues of credits and debits for expenses that have been paid, or bills that are outstanding, but nothing, as the parties have testified, that is so insurmountable to the overall global settlement of this matter, that they wish to have a trial on those issues. So, what the parties have entered into is an agreement that if they cannot, within the next few weeks, mediate those minor disagreements, they will submit by way of post[-]judgment motion for this [c]ourt to make a call on those remaining economic discrepancies.
>
> I have explained to the parties that [the] term sheet is a final, binding, fully enforceable agreement, no different than if we had had a trial . . . . Although, today, I am not making findings regarding the reasonableness or the fairness of the agreement, but only that it is the product of the parties' mutual accord.

6

In the months that followed, the parties failed to agree on a global PSA, and both parties eventually retained new counsel. However, despite the exchange of correspondence between the new attorneys, the outstanding issues remained unresolved. Ultimately, plaintiff moved to enforce the provisions of the term sheet. Pertinent to this appeal, plaintiff sought an order specifically directing defendant (1) "to refinance the marital residence to remove [his] name from the mortgage within sixty . . . days of a [c]ourt order[;]" (2) "to provide [him] with access to the marital home so he may remove his personal and business property within two . . . weeks of . . . a [c]ourt order[;]" (3) to "permit[ him] to continue to pay the mortgage [on the marital residence] directly as part of [his] alimony obligation[;]" (4) "[to] be responsible for $47,072.80" of their son's "college costs,"[2] and to "waive[] her right to receive the [$45,000] equitable distribution payable at [$9000] per year for five years" as an offset for her college contribution; and (5) "[to] attend mediation to resolve the remaining

_____

[2]  Plaintiff asserted that based on his annual gross income of $120,000, and defendant's annual gross income of $80,000, he should pay sixty percent and defendant should pay forty percent of their son's college costs which totaled $117,682 for six semesters at the University of Tennessee. In calculating their respective incomes, plaintiff accepted the forensic accountant's "recommendation that [his] annual gross earned income was . . . $160,000[]," less $40,000 for his alimony obligation, and "defendant's was . . . $40,000[]," plus $40,000 in alimony.

issues," with "the parties [to] share the cost of mediation equally." Plaintiff also sought counsel fees based on defendant's "bad faith." In a supporting certification, plaintiff asserted he had "no choice but to file th[e m]otion" because the parties had "reached a complete standstill."

Defendant opposed plaintiff's motion, and cross-moved to "vacat[e] the [t]erm [s]heet," and reinstate plaintiff's pendente lite obligations. Defendant also sought an award of counsel fees, and an order directing plaintiff to contribute to a litigation fund and bear the cost of any mediation based on his "far superior financial position," "his unclean hands and terroristic litigation tactics." In support, defendant certified she was "forced" and "pressured" to execute the term sheet by the forensic accountant, who "bullied" and "demeaned" her during the mediation,[3] and her "prior counsel," against whom she had filed "a malpractice suit." According to defendant, her attorney also "failed to properly voir dire [her]" at the divorce hearing, and misrepresented to

---

[3] Defendant certified that she "recorded the entire mediation with [the forensic accountant] because [she] felt bullied and intimidated." It is unclear in the record whether the recording was submitted to the court. See Willingboro Mall, Ltd. v. 240/242 Franklin Ave., L.L.C., 215 N.J. 242, 255 (2013) ("[O]ur court and evidence rules and the Mediation Act confer a privilege on mediation communications, ensuring that participants' words will not be used against them in a later proceeding." (citing R. 1:40 to 1:40-12, N.J.S.A. 2A:23C-1 to -13, N.J.R.E. 519)).

A-5583-17T3

the court "the status of th[e] matter" because the case "was not close to being settled in August[4] or in November[, 2017]."

Further, defendant averred that "[t]he foundation upon which the term sheet was created was not solid" because "it was formed on misinformation, lack of information, and a pressure to settle th[e] matter on the eve of trial." In particular, defendant asserted "no extensive discovery was conducted, no appraisal was done as to the value of the marital home, and no formal valuation was ever provided as to [p]laintiff's business."[5] According to defendant, the term sheet was "both inequitable and unjust," "[was] missing essential terms,"

---

[4] Pursuant to an August 1, 2017 case management order, "[t]he mediation" would "conclude within [thirty] days of receipt of the [final] appraisal, and in no event later than October 25, 2017." Further, an "uncontested hearing" would be scheduled on November 6, 2017, prior to which time the "[p]arties and counsel [were] expected to have executed the [PSA]." Under the order, counsel was supposed to immediately notify the court "[i]f any unanticipated issue of a material nature [arose] prior to [November 6]," in which case the hearing would be "converted to a case management/status/settlement conference." However, "[i]f the court [was] not notified in advance, and the matter [could not] proceed as an uncontested hearing, . . . the parties [would] be expected to begin trial on the about date and time."

[5] See R. 1:40-5(b)(3) ("In mediation of economic aspects of family actions, parties are required to provide accurate and complete information to the mediator and to each other, including but not limited to tax returns, [c]ase [i]nformation [s]tatements [CISs], and appraisal reports.").

and would result in "essentially re-litigating [the] divorce by way of post-judgment applications."

Additionally, defendant pointed out that at the divorce hearing, neither counsel identified the "outstanding issue[s]," other than making a generic reference to "mere 'debits and credits.'" However, according to defendant, the "outstanding issues" included "[h]ealth insurance," "debt allocation," "[c]ollege contribution," "[r]efinanc[ing] of the debts associated with the former marital home," "credits . . . due and owing to [her] as a result of [p]laintiff's non-payment of pendente lite support," and "[p]ayment of the outstanding bill to [the forensic accountant]." In addition, defendant stated the alimony terms, including its tax consequences, were unclear, and there were "no mechanisms included [in the term sheet] as to how or when payments of alimony or equitable distribution [were] to be paid, when the marital home was to be refinanced, or even the amount of life insurance that [p]laintiff was to provide."

Defendant continued that when plaintiff's attorney sent her a draft PSA "which effectively undermine[d] the entirety of the term sheet," her attorney "tried to resolve these issues" but "the response was that [plaintiff was] not going to relitigate the issues." Nonetheless, according to defendant, plaintiff's draft PSA and enforcement motion sought to do exactly that by "add[ing] terms that

A-5583-17T3

were missing and modify[ing] existing terms that were included" in the term sheet. Specifically, defendant asserted plaintiff sought an order (1) requiring her to refinance the marital residence within sixty days when the term sheet contained "no time frame" and plaintiff failed to pay off the SBA loan on the residence as required in the term sheet to facilitate the refinance; (2) providing him with access to the residence to remove his personal and business property when the term sheet only allowed him to remove "specific items[;]" (3) permitting him to deduct the mortgage payments from his alimony obligation when the term sheet does not entitle him to "a credit for these payments[;]" and (4) requiring her to contribute $47,072.80 to their son's college costs and allow an offset of the $45,000 equitable distribution payment when the college contribution amount was never agreed to,[6] plaintiff failed to provide proof of his "college contribution[s]," and plaintiff "has not made a single payment toward the $45,000 equitable distribution payments . . . agreed to" in the term sheet. In a reply certification, plaintiff refuted most of defendant's accusations.

---

[6] Defendant also disputed plaintiff's claim that her income was determined to be $40,000 at the mediation, explaining that at the time, she had been "laid off from [her] job" and was collecting temporary "disability income" due to her medical condition.

Following oral argument, a second judge denied both motions, except for granting plaintiff's request that the parties "attend mediation with [a retired judge] . . . to address all outstanding issues and/or consent to changes of the [t]erm [s]heet." In the written statement of reasons accompanying the June 29, 2018 order, the judge determined defendant failed to "establish[] an acceptable basis for which the [t]erm [s]heet should be vacated pursuant to [Rule] 4:50-1." In support, the judge explained that defendant did "not provide any documentation to support her assertion" that "she was pressured into signing the [t]erm [s]heet by her attorney and [the forensic accountant]," and has "not alleged that . . . [p]laintiff committed any acts in bad faith."

Further, upon reviewing the transcript of the November 6, 2017 divorce hearing, the judge found "the parties willingly and voluntarily entered into the [t]erm [s]heet," and "intended to include these terms into a more comprehensive [PSA] after the parties were divorced." The judge pointed out that "the [c]ourt took extra steps to ensure that the parties[] understood the legal significance of the [t]erm [s]heet as a binding and enforceable legal document." Accordingly, the judge concluded that "the [t]erm [s]heet . . . remain[ed] in full force and effect."

Turning to each party's request for counsel fees, after applying the Rule 5:3-5(c) factors and the governing caselaw, the judge denied both requests. The judge explained that "[b]oth parties appear[ed] to be acting in good faith to settle outstanding issues relative to the[ir] . . . divorce," but "both parties [were] mostly unsuccessful in their prayers for relief." In specifically denying defendant's request to "order . . . [p]laintiff to provide $50,000[] for a litigation fund for [her] counsel and expert fees and costs" pursuant to N.J.S.A. 2A:34-23, the judge acknowledged that while "plaintiff did not include a [CIS] with his motion," it "appear[ed] that . . . [p]laintiff [was] making a higher income than . . . [d]efendant," who was "receiving alimony payments." Nonetheless, because "[t]he parties [were] ordered to attend mediation and there [were] no other pending matters on the [c]ourt's calendar at th[e] time," a litigation retainer was not warranted.

On August 3, 2018, defendant filed a notice of appeal from the June 29, 2018 order. While the appeal was pending, defendant moved to enforce the provisions of the term sheet she had previously sought to vacate. Specifically, defendant sought an order directing plaintiff to (1) pay his alimony obligation "through the . . . [p]robation [d]epartment" on "the first . . . of each month[;]" (2) "pay [d]efendant $18,000[] within seven . . . days" of the order "for his first

13

two missed equitable distribution payments" and "pay an additional sum of $750[] per month" thereafter "until the . . . $45,000[]" was paid off; (3) "immediately remove the SBA [l]oan"[7] from the marital residence; and (4) pay "counsel fees and costs in connection with th[e] motion." In her supporting certification, defendant asserted she was "forced to file [the motion] due to [p]laintiff's unilateral decision to pay support when and how he wants and his refusal to comply with the term[ sheet]."

Plaintiff opposed the motion, and cross-moved to find defendant in violation of the June 29, 2018 order. In support, plaintiff certified that "[d]espite repeated requests," defendant "failed to attend mediation as it [was] her position that there [was] essentially nothing to mediate." Further, because plaintiff believed "[t]here [was] absolutely no need for [defendant's m]otion . . . as the issues being raised should have been addressed in mediation," he also sought an award of "counsel fees and costs."

During oral argument, the judge acknowledged the parties' conflicting positions, noting that defendant wanted "to vacate the term sheet and at the same time . . . enforce the term sheet," while plaintiff wanted to "enforce the term sheet" while failing "to comply with all [its] terms." Following oral argument,

---

[7] Defendant reported the loan amount was then $96,000.

in a February 28, 2019 order, the judge denied both motions except to again order the parties to attend mediation "within thirty . . . days of th[e] [o]rder" and "share the cost of said mediation equally." In the accompanying written statement of reasons, the judge explained "[t]he entirety of [defendant's] requested relief [were] matters the parties should address at mediation." However, because defense counsel "clerked" for the retired judge appointed to mediate "approximately twenty . . . years ago," the judge modified her prior order by replacing the judge with an attorney in "an effort to avoid even the appearance of a conflict." Additionally, applying the applicable factors, the judge again denied all "counsel fees and costs," explaining that while plaintiff "appear[ed] to be acting in good faith" in "seek[ing] to enforce the [c]ourt's prior order," defendant's "good faith [was] somewhat questionable, as she refused to follow [the c]ourt [o]rder to attend mediation." Thereafter, defendant was granted leave to amend the original notice of appeal to include the February 28, 2019 order.

On appeal, defendant argues "the [t]erm [s]heet is so vague and ambiguous that it is not even capable of enforcement," and "the few limited terms that are included . . . omit specifics as to the implementation of the terms." According to defendant, "the first mistake" occurred when the first judge "allowed the

divorce to be put through under these circumstances," and "[t]he second mistake" occurred when the second judge "refused to vacate the [t]erm [s]heet and [the DJOD] and put the parties back to the status prior to the divorce in order to properly and completely negotiate a comprehensive agreement." Defendant contends that "[i]f the [t]erm [s]heet . . . is not vacated, the parties will be forced to engage in lengthy and expensive post-judgment litigation that would essentially be akin to them re-litigating the[] matter."

"Rule 4:50-1 provides for relief from a judgment in six enumerated circumstances," In re Estate of Schifftner, 385 N.J. Super. 37, 41 (App. Div. 2006), and "does not distinguish between consent judgments and those issued after trial." DEG, LLC v. Twp. of Fairfield, 198 N.J. 242, 261 (2009). Importantly, Rule 4:50-1 does not provide "an opportunity for parties to a consent judgment to change their minds; nor is it a pathway to reopen litigation because a party either views his [or her] settlement as less advantageous than it had previously appeared, or rethinks the effectiveness of his [or her] original legal strategy." Ibid. "Rather, the rule is a carefully crafted vehicle intended to underscore the need for repose while achieving a just result." Ibid. Thus, the rule "denominates with specificity the narrow band of triggering events that will warrant relief from judgment if justice is to be served" and "[o]nly the existence

of one of those triggers will allow a party to challenge the substance of the judgment." Id. at 261-62.

Here, defendant relies on Rule 4:50-1(f). That subsection provides, in relevant part, that "[o]n motion, with briefs, and upon such terms as are just, the court may relieve a party . . . from a final judgment or order for . . . any other reason justifying relief from the operation of the judgment or order." Generally, "[t]he application of this subsection requires the demonstration of 'exceptional circumstances.'" Schifftner, 385 N.J. Super. at 41 (quoting Court Inv. Co. v. Perillo, 48 N.J. 334, 341 (1966)). Thus, to obtain relief under subsection (f), a movant must show that the enforcement of the order "would be unjust, oppressive or inequitable." Greenberg v. Owens, 31 N.J. 402, 411 (1960) (Jacobs, J., dissenting) (citation omitted). However, the boundaries under this subsection "are as expansive as the need to achieve equity and justice." Hous. Auth. of Morristown v. Little, 135 N.J. 274, 290 (1994) (quoting Palko v. Palko, 73 N.J. 395, 398 (1977)).

Although courts are empowered under Rule 4:50-1 "to confer absolution" from judgments, DEG, 198 N.J. at 261, relief "is granted sparingly." F.B. v. A.L.G., 176 N.J. 201, 207 (2003) (citing Pressler & Verniero, Current N.J. Court Rules, cmt. 1.1 on R. 4:50-1 (2003)). "On appellate review, the trial judge's

determination 'will be left undisturbed unless it represents a clear abuse of discretion.'" DEG, 198 N.J. at 261 (quoting Little, 135 N.J. at 283). "'[A]buse of discretion' . . . arises when a decision is 'made without a rational explanation, inexplicably departed from established policies, or rested on an impermissible basis.'" Flagg v. Essex Cty. Prosecutor, 171 N.J. 561, 571 (2002) (quoting Achacoso-Sanchez v. Immigration & Naturalization Serv., 779 F.2d 1260, 1265 (7th Cir. 1985)). "The discretion afforded to a trial court under the Rule also includes the duty to consider evidence in the record that militates against the grant of relief." Little, 135 N.J. at 290.

Although a "[motion] judge's legal conclusions . . . are subject to our plenary review," Spangenberg v. Kolakowski, 442 N.J. Super. 529, 535 (App. Div. 2015) (quoting Reese v. Weis, 430 N.J. Super. 552, 568 (App. Div. 2013)), we accord deference to the family courts because of their "special jurisdiction and expertise in family matters" and will "not disturb [their] 'factual findings and legal conclusions . . . unless [we are] convinced that they are so manifestly unsupported by or inconsistent with the competent, relevant and reasonably credible evidence as to offend the interests of justice.'" Cesare v. Cesare, 154 N.J. 394, 412-13 (1998) (quoting Rova Farms Resort, Inc. v. Inv'rs Ins. Co., 65 N.J. 474, 484 (1974)).

Here, in denying defendant relief under <u>Rule</u> 4:50-1(f), the judge considered the principles applicable to the enforcement of settlement agreements. It is well settled that "[p]ublic policy favors the settlement of disputes." <u>Willingboro</u>, 215 N.J. at 253. "[S]ubject to the same standards as that in any other case," <u>Brawer v. Brawer</u>, 329 N.J. Super. 273, 282 (App. Div. 2000), "in matrimonial matters . . . settlement agreements, being 'essentially consensual and voluntary in character[,] . . . [are] entitled to considerable weight with respect to their validity and enforceability' in equity, as long as they are fair and just." <u>N.H. v. H.H.</u>, 418 N.J. Super. 262, 279 (App. Div. 2011) (second, third, and fourth alterations in original) (quoting <u>Petersen v. Petersen</u>, 85 N.J. 638, 642 (1981)). <u>See Brawer</u>, 329 N.J. Super. at 284 ("It is true, of course, that a [PSA] between spouses is enforceable only if it is completely voluntary, fair and equitable.").

A "settlement agreement reduced to writing and properly adopted by the parties" as a result of the mediation process is given the same force and effect as any other type of settlement agreement. <u>Willingboro</u>, 215 N.J. at 256-57 ("Before the parties leave the mediation, the mediator should insist that a short form settlement agreement (term sheet) be drafted by one of the attorneys and signed by the parties at the mediation table." (citing Civil Practice Div.,

Mediator's Tool Box: A Case Management Guide for Presumptive Roster Mediators 11 (Nov. 2011), http://www.judiciary.state.nj.us/civil/mediators_ toolbox.pdf)). As a result, "fair and definitive arrangements arrived at by mutual consent should not be unnecessarily or lightly disturbed." Bermeo v. Bermeo, 457 N.J. Super. 77, 83 (2018) (quoting Konzelman v. Konzelman, 158 N.J. 185, 193-94 (1999)). Thus, absent fraud or coercion, a court is obligated to enforce the terms of the settlement agreement when entered into by "fully informed" parties. Avelino-Catabran v. Catabran, 445 N.J. Super. 574, 590 (App. Div. 2016) (quoting Quinn v. Quinn, 225 N.J. 34, 55 (2016)).

That said, "[l]ike any contract, . . . the terms of the agreement must 'be sufficiently definite [so] "that the performance to be rendered by each party can be ascertained with reasonable certainty."'" GMAC Mortg., LLC v. Willoughby, 230 N.J. 172, 185 (2017) (second alteration in original) (quoting Weichert Co. Realtors v. Ryan, 128 N.J. 427, 435 (1992)). "[T]he fact that when read literally, an agreement may seem indefinite does not necessarily require a conclusion that it may not be specifically enforced." Graziano v. Grant, 326 N.J. Super. 328, 339 (App. Div. 1999). "Reasonable certainty of the terms is all that is required" for enforceability. Ibid. "If the parties agree on essential terms and further

manifest an intention to be bound by those terms, they have created an enforceable contract." Id. at 339-40.

"[T]he absence of agreement on . . . details" is "immaterial" when "they would not have prevented implementation of the agreement." Brawer, 329 N.J. Super. at 283. Moreover, "when there is a missing term that is essential to implementation of a matrimonial agreement," then "the court may supply the missing term." Quinn, 225 N.J. at 46. Indeed, "it is not necessary for a writing to contain every possible contractual provision to cover every contingency in order to qualify as a completed binding agreement." Berg Agency v. Sleepworld-Willingboro, Inc., 136 N.J. Super. 369, 376 (App. Div. 1975). "[T]he parties may resolve such differences by subsequent agreement." Id. at 377. "In any event, [an agreement] is no less [an agreement] because some preferable clauses may be omitted either deliberately or by neglect." Ibid. "So long as the basic essentials are sufficiently definite, any gaps left by the parties should not frustrate their intention to be bound. Such is the just and fair result." Ibid.

Judged by these standards, we agree with the judge that the term sheet constituted an enforceable settlement agreement, signed by the parties and their respective attorneys, evidencing an intent to be bound by its terms. Contrary to

defendant's assertions,[8] the provisions in the term sheet are sufficiently definite to allow the parties to render performance with reasonable certainty, and the absence of agreement on certain details is immaterial because those details do not prevent implementation of the agreement. Indeed, although the timing and mechanism to effectuate certain provisions are not specified, there is no dispute and no ambiguity regarding plaintiff's open duration and limited duration alimony obligation, plaintiff's responsibility to obtain life insurance sufficient to secure his alimony obligation, equitable distribution of the marital residence, the business, and specified pieces of plaintiff's property, the parties' obligation to contribute to their younger son's college education, and the parties' responsibility for their respective counsel fees. Because "the basic essentials are sufficiently definite, any gaps left by the parties should not frustrate their intention to be bound." Ibid.

---

[8] Defendant relies in part on unpublished opinions to support her position, but such opinions have no precedential value. See Brundage v. Estate of Carambio, 195 N.J. 575, 592-93 (2008) (acknowledging that Rule 1:36-3 "provides that '[n]o unpublished opinion shall constitute precedent or be binding upon any court.'" (quoting R. 1:36-3)); see also Sauter v. Colts Neck Volunteer Fire Co. No. 2, 451 N.J. Super. 581, 600 n.9 (App. Div. 2017) ("While litigants are free to cite unpublished opinions to the court in accordance with Rule 1:36-3, the court is, of course, free to disregard them.").

Further, the extensive voir dire by counsel and questioning by the judge during the divorce hearing belie defendant's claim that she signed the agreement under duress. "A contracting party is bound by the apparent intention he or she outwardly manifests to the other party. It is immaterial that he or she has a different, secret intention from that outwardly manifested." Brawer, 329 N.J. Super. at 283 (quoting Hagrish v. Olson, 254 N.J. Super. 133, 138 (App. Div. 1992)). We are satisfied defendant failed to demonstrate the "truly exceptional circumstances" required to obtain relief under Rule 4:50-1(f), C.R. v. J.G., 306 N.J. Super. 214, 241 (Ch. Div. 1997), and we discern no abuse of discretion in the judge's denial of defendant's motion to vacate the DJOD and incorporated term sheet.[9]

Defendant also asserts that the second judge compounded the mistake by ordering the parties to incur "the onerous burden . . . and expense" of mediating the dispute without providing "any guidance" and in the absence of a "provision"

---

[9] We reject defendant's contention that the judge should have conducted a plenary hearing to determine the validity of the term sheet. Unlike Harrington v. Harrington, 281 N.J. Super. 39, 47 (App. Div. 1995), where the parties disputed "whether there was an oral agreement," or Lehr v. Afflitto, 382 N.J. Super. 376, 383 (App. Div. 2006), where the parties disputed whether they "had a meeting of the minds regarding the settlement terms during mediation," here, there were no disputed material issues of fact as to whether the parties reached an agreement.

in the term sheet or the DJOD "for the parties to mediate prior to filing with the court." Defendant points out that rather than requiring mediation, the DJOD expressly "reserve[s] the parties' absolute right to file post-judgment motions."

"[M]ediation provides an alternate, more informal forum than litigation, allowing confidential and candid exchange of information between the parties and the mediator to aid the parties' efforts in reaching an accord on disputes." Minkowitz v. Israeli, 433 N.J. Super. 111, 139 (App. Div. 2013). "Our court system encourages mediation as an important means of settling disputes." Willingboro, 215 N.J. at 254. However, mediation is, at times, a more expensive process than a mere settlement attempt. See R. 5:5-6; R. 1:40-5(b). Nonetheless, "Rule 1:40-4(a) authorizes, in certain cases, a Superior Court judge to 'require the parties to attend a mediation session at any time following the filing of a complaint.'" Willingboro, 215 N.J. at 254 (quoting R. 1:40-4(a)). In particular, pursuant to Rule 5:5-6, "an order for mediation" of "the economic aspects of a divorce" "shall be entered" "[i]n any matter in which a settlement is not achieved." R. 5:5-6(a). "Unless good cause is shown . . . litigants shall be required to participate in the program for no more than two hours." R. 5:5-6(b). However, "[p]articipation after the first two hours shall be voluntary." Ibid.

Here, the parties had participated in several hours of mediation spanning eight months before they executed the term sheet that was incorporated into the DJOD. While there was discussion by the court and counsel at the divorce hearing that the parties would engage in mediation to resolve the outstanding issues in a global PSA, the term sheet does not contain a mediation clause. We are convinced that grafting such a clause onto the term sheet binds the parties to an agreement they did not make. Levison v. Weintraub, 215 N.J. Super. 273, 276 (App. Div. 1987) ("We have no right 'to rewrite the contract merely because one might conclude that it might well have been functionally desirable to draft it differently.'" (quoting Brick Twp. Mun. Util. Auth. v. Diversified R.B. & T. Constr. Co., 171 N.J. Super. 397, 402 (App. Div. 1979))). We therefore conclude the judge erred in ordering the parties to attend mediation, and reverse and remand for the judge to resolve the outstanding issues not addressed in the term sheet, including permitting discovery and conducting a plenary hearing, if appropriate. See Lepis v. Lepis, 83 N.J. 139, 159 (1980) ("[A] party must clearly demonstrate the existence of a genuine issue as to a material fact before a hearing is necessary.").

Our conclusion in this regard is also informed by Rule 5:7-8's prohibition against "[b]ifurcation of trial of the marital dissolution . . . from trial of disputes

over support and equitable distribution" except "in extraordinary circumstances and for good cause shown." Because the term sheet incorporated into the DJOD did not contain all the provisions necessary to finalize the dissolution, this matter has some of the hallmarks of the disfavored bifurcated divorce. "[A]lthough bifurcation would allow entry of a partial judgment of divorce thereby enabling the spouses to remarry, 'once divorce is granted, there will be much less incentive . . . to finalize any other issues.'" Frankel v. Frankel, 274 N.J. Super. 585, 591 (App. Div. 1994) (alteration in original) (quoting Leventhal v. Leventhal, 239 N.J. Super. 370, 377 (Ch. Div. 1989)).

> The advent of mediation and other alternative dispute resolution methods as tools to assist parties in resolving their disputes as early as possible and with the least amount of financial and emotional strain is an admirable and worthwhile effort of the court system. Ultimately, however, in an adversarial system with limited resources, the success of mediation is dependent on the good faith, reasonableness and willingness of the litigants to participate. Many are able to do so successfully. However, litigants are not fungible. For one reason or another, some are simply not good candidates for case resolution through good-faith alternative dispute resolution methods such as mediation. Early identification of those who are not is difficult; we have the benefit of hindsight, trial courts do not.
>
> [Lehr, 382 N.J. Super. at 398.]

"Given the parties' acrimonious relationship, as reflected in the manner they have behaved throughout this litigation, it appears to us unlikely that mediation will be successful." <u>D.A. v. R.C.</u>, 438 N.J. Super. 431, 452 (App. Div. 2014). To avoid further prolonging an already protracted process, at this juncture, we believe the judge should adjudicate the outstanding issues.

Finally, defendant challenges "the denial of . . . counsel fees and/or [a] litigation fund" in the June 29, 2018 order only. Defendant argues the judge "focused on two of the nine factors enumerated in <u>Rule</u> 5:3-5(c)," and "ignor[ed] the fact that [p]laintiff filed the initial unnecessary application, has a far greater ability to fund the litigation," and "brought [the application] in bad faith."

Pursuant to N.J.S.A. 2A:34-23, when a party makes "an application for . . . counsel fees, the court shall determine the appropriate award for counsel fees, if any, . . . consider[ing] the factors set forth in [<u>Rule</u> 5:3-5], the financial circumstances of the parties, and the good or bad faith of either party." N.J.S.A. 2A:34-23 also permits the court to "order one party to pay a retainer on behalf of the other for expert and legal services when the respective financial circumstances of the parties make the award reasonable and just," considering "the financial capacity of each party to conduct the litigation and the criteria for award of counsel fees . . . as set forth by court rule."

27

To determine whether and to what extent such an award is appropriate, the court must consider:

> (1) the financial circumstances of the parties; (2) the ability of the parties to pay their own fees or to contribute to the fees of the other party; (3) the reasonableness and good faith of the positions advanced by the parties both during and prior to trial; (4) the extent of the fees incurred by both parties; (5) any fees previously awarded; (6) the amount of fees previously paid to counsel by each party; (7) the results obtained; (8) the degree to which fees were incurred to enforce existing orders or to compel discovery; and (9) any other factor bearing on the fairness of an award.

[Slutsky v. Slutsky, 451 N.J. Super. 332, 366 (App. Div. 2018) (quoting R. 5:3-5(c)).]

"The assessment of counsel fees is discretionary" and we "will disturb a trial court's determination on counsel fees only on the 'rarest occasion,' and then only because of clear abuse of discretion." Id. at 365 (quoting Strahan v. Strahan, 402 N.J. Super. 298, 317 (App. Div. 2008)). For example, in Reese, we affirmed the judge's denial of counsel fees although the judge did not "specifically enumerat[e] every factor identified in the court rule and statute." 430 N.J. Super. at 586. We reasoned that the judge acted within her discretion to deny the defendant's request because "[s]he found each party had sufficient ability to satisfy his or her attorney's fee obligation, and neither had proceeded

in bad faith, but rather presented reasonable positions." Ibid. Likewise, here, the judge provided adequate support for her determination, which was amply supported by the record.

In sum, we affirm the judge's denial of defendant's cross-motion to vacate the DJOD and term sheet incorporated therein, and we affirm the judge's denial of counsel fees and a litigation fund. However, we reverse the judge's order directing the parties to attend mediation, and remand for further proceedings consistent with this opinion. Based on our decision, we need not address defendant's remaining arguments.

Affirmed in part, reversed and remanded in part. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-5583-17T3